RECEIVED

JUN 1 2 2013

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| ERICA P. BORILL | CIVIL ACTION NO. 6:11CV1492 |
| VERSUS | JUDGE DOHERTY |
| CENTENNIAL WIRELESS, INC., ET AL. | MAGISTRATE JUDGE HANNA |

### RULING

Currently pending before the Court is defendants' motion in limine [Doc. 86], whereby defendants seek a ruling from this Court "prohibit[ing] plaintiff's neurological expert, Dr. Ralph Lilly from testifying in the trial of this matter." [Doc. 86, p.2] Alternatively, defendants move the Court to "limit Dr. Lilly's testimony, particularly excluding his testimony concerning the supposed existence of PTSD or hyperhidrosis. . . ." [Id.] For the following reasons, the motion is DENIED.

Plaintiff brings this suit for damages she allegedly sustained when she slipped and fell on July 2, 2010, at defendants' retail store location, located at 2002 North Parkerson Avenue in Crowley, Louisiana. All parties agree plaintiff suffered a mild traumatic brain injury as a result of her fall. [Id. at 8; *see also* Doc. 86-17, p. 17] Following the incident, plaintiff was transported via ambulance to the hospital American Legion Hospital. Thereafter, plaintiff began treatment with various physicians, including neurologist Dr. Wael Karim of Lafayette, Louisiana. Dr. Karim subsequently referred plaintiff to Dr. Ralph Lilly, a neurologist based in Houston, Texas. As noted, defendants now seek a ruling from this Court, prohibiting Dr. Lilly from testifying at the trial of this matter.

1

Defendants' argument, generally, is summarized as follows:

> Defendants do not dispute Dr. Lilly's credentials as a neurologist. Defendants also do not dispute the admissibility of neurological testimony in general in cases such as this. It is the specific approach of Dr. Lilly that is problematic and should be stricken. Specifically, Dr. Lilly relied entirely on the patient's subjective reported symptoms for making the diagnosis of brain damage. Dr. Lilly ignores other methods of assessment including brain scans (all of which were normal in this case). His opinions in this regard are counter to the scientific literature as he does not adhere to scientific principles that are well-established within his profession (including dose response, or the ways in which various prescription medications can effect a patient's medical state) for understanding the nature of symptoms in traumatic brain injury. Although Dr. Lilly draws very firm opinions about brain damage based on this methodology, there is neither a scientific, nor a factual foundation for him to do so and his method produces contradictory opinions and results, and thus is unreliable and fails to meet the *Daubert* standard, and accordingly it should be disallowed.

[Doc. 86-1, p.5]

**I.      Applicable Law**

Rule 702 of the Federal Rules of Evidence provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993); *see also Kuhmo Tire Co., Ltd. v. Carmichael,*

526 U.S. 137, 141 (1999). "To determine whether proffered testimony is reliable, the trial court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Brown v. Illinois Central Railroad Company*, 705 F.3d 531, 535 (5th Cir. 2013) (quoting *Daubert* at 592-93); *see also* Fed.R.Evid. 104(a).

The Supreme Court's *Daubert* opinion lists several factors a trial court may use to determine an expert's reliability: the extent to which the expert's theory can be or has been tested; whether the theory has been subjected to peer review and publication; any known or potential rate of error; the existence and maintenance of standards governing operation of the technique; and whether the method or theory has been generally accepted in the relevant scientific community. *Daubert*, 509 U.S. 593-95; *see also Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).[1] Although there is no prescribed test a court must apply to determine an expert's reliability, "the existence of sufficient facts and a reliable methodology is in all instances mandatory." *Hathaway* at 318. The inquiry is "flexible," with the focus being "solely on principles and methodology, not on the conclusions that they generate." *Daubert* at 594-95. The burden of proof for admissibility rests upon the proponent of the expert testimony. *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The proponent need not prove the expert's testimony is correct, but he or she must prove by a preponderance of the evidence that the testimony is reliable. *Id.*

---

[1] "These factors are not mandatory or exclusive; the district court must decide whether the factors discussed in *Daubert* are appropriate, use them as a starting point, and then ascertain if other factors should be considered." *Hathaway*, 507 F.3d at 318 (citing *Black v. Food Lion* 171 F.3d 308, 311-12 (5th Cir. 1999).

## II. Analysis

### A. Scientific Foundation

Defendants first argue "Dr. Lilly's methods lack scientific foundation," because: (1) "Dr. Lilly in his deposition indicated that he is of the opinion that numerous subjective symptoms, including cognitive and emotional symptoms can be related to *permanent brain damage* from such an injury, despite the fact that this notion is not supported in the medical literature," [Doc. 86-1, p.8 (emphasis in original)] and (2) two of the publications upon which Dr. Lilly relies, in part, in supporting his opinions are not the most current editions of those publications.[2] [Id. at 8-9] Stated otherwise, defendants disagree with Dr. Lilly's opinion as to the effects and/or disabilities that can result from a mild traumatic brain injury, arguing Dr. Lilly has relied upon outdated publications in support of that opinion.

Defendants have provided this Court with four articles in support of their position that "there is insufficient evidence to determine whether mild traumatic brain injury is associated with cognitive deficits 6 months or longer post injury." [Id. at 8-9] However, defendants have not shown that the studies upon which Dr. Lilly relies are unreliable or irrelevant. In fact, one particular study submitted by defendants in support of their position appears to actually support Dr. Lilly's testimony. [*See* Doc. 86-15, p.1 ("Most patients with mild TBI [traumatic brain injury] recover within weeks to months without specific intervention, *but at 1 year after injury approximately 15% of patients still*

---

[2]The sources with which defendants take issue were cited by Dr. Lilly in support of his opinion that fifteen to twenty percent of persons who suffer a minimal traumatic brain injury may be incapacitated for a year or more. [Doc. 86-17, pp. 17, 18] Dr. Lilly cited nine publications supporting his opinion. As defendants note, two of the publications cited were not the most current editions. (Dr. Lilly volunteered that one of those two sources was not the current edition, adding that he had ordered the most recent edition.)

4

*have disabling symptoms.*" (Emphasis added)] Furthermore, while defendants take issue with two specific references upon which Dr. Lilly relies (*i.e.* a 1994 Dikmen study and a Zasler book)[3], they fail to address the seven other publications upon which Dr. Lilly relied to support his position. [*See e.g.* Doc. 86-17, pp. 17-19] Accordingly, the Court is not persuaded it should exclude Dr. Lilly from providing expert testimony at trial, on the basis that his opinions lack scientific foundation.

### B.  Reliability

Defendants next argue, "Dr. Lilly utilizes a non-scientific approach which is inherently unreliable." [Doc. 86-1, p.13 (emphasis omitted)] According to defendants, Dr. Lilly utilizes a "clinical approach" in his treatment of patients with head injuries, which "runs counter to the scientific literature in his profession and lacks any scientific foundation." [Id.] Defendants argue Dr. Lilly "indicates he does not use the acute injury characteristics as part of his assessment despite the fact that the scientific literature on brain injury outcome is based on acute injury characteristics. . . ."[4] [Id.] Defendants conclude: "There is a large body of scientific literature suggesting that patients that are in the category of mild traumatic brain injury . . . have only temporary neurologically based problems," defendants' expert witness found "Ms. Borill had nothing worse than a concussion," and

---

[3]Of note, Dikmen has authored hundreds of publications, and at least 4 of those were published in 1994. Because there is no reference to the specific study upon which Dr. Lilly relied, it is not even clear to this Court that the 1994 and 2009 studies are on the same topic. With regard to the Zasler publication, a review of Dr. Lilly's deposition reveals the Zasler book upon which he relies was published in 2007. [Doc. 86-17, p.17] As the Court has not been provided with the newer edition of the Zasler book, the Court is unaware whether the 2007 publication is no longer considered sound science.

[4]In support of this argument, defendants cite to a portion of Dr. Lilly's deposition wherein he is asked whether he uses "a continuum or a scale to reference how severe the injury is," when he classifies the severity of a patient's brain injury. [Doc. 86-17, p. 19] Dr. Lilly testified generally he does not use a scale, although he sometimes uses the Glasgow Outcome Scale. He explains the criteria he uses to classify severity, concluding that while he finds the scales beneficial for "academic purposes," for his purposes, "the outcome is based on the clinical issues of that particular patient, the duration of the symptoms and the outcome." [Id.]

"[t]herefore, following the scientific foundations of neurology, one would not expect permanent neurologically based impairments." [Id. at 14]

Dr. Lilly is board certified in neurology, currently holds medical licenses in Texas and Rhode Island, and regularly sees patients with brain injuries in his practice. [Doc. 86-17, pp. 8, 9] At his deposition, he explained the methodology he utilized to determine the scope of plaintiff's brain injuries in this case. [Id. at 19-20] Defendants have not shown that Dr. Lilly's "clinical approach" is unreliable, and though defendants assert there is a better alternative (*i.e.* an approach based upon acute injury characteristics), this disagreement is not a proper basis to exclude Dr. Lilly's testimony. *See e.g. Primrose Operating Co. v. National American Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004)("[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration.")(emphasis in original)(quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

C. **Examination of alternate causes**

Defendants next argue, "Dr. Lilly's causal leap that all of the patient's cognitive and emotional symptoms are caused by brain damage related to the incident accident reveals an unwillingness to examine alternate causes." [Doc. 86-1, p. 14] Specifically, defendants argue because Dr. Lilly did not review the EMS records[5] or plaintiff's academic records predating the slip and fall[6],

---

[5]After a review of Dr. Lilly's entire deposition, it does appear he had reviewed the EMS records, although he did not seem to recall their contents at his deposition. [Doc. 86-17, p. 43; *see also* id. at p. 10 (referring to Glasgow Coma Scale and CT scan); Doc. 86-12, p.1 (stating he has reviewed the American Legion Hospital Records)]

[6]At his deposition, Dr. Lilly testified academic records "would give you some insight," but went on to explain why such records were not particularly helpful for his purposes. [Doc. 86-17, p.13]

and because, as defendant's interpret Dr. Lilly's deposition testimony, he demonstrated a "lack of concern with the plaintiff's use of various medications,"[7] Dr. Lilly is "uninterested in even considering alternative findings in this patient."

These argued "weaknesses" in Dr. Lilly's methodology are not a proper basis to exclude his testimony under *Daubert*. "As the Court in *Daubert* makes clear, . . . the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *14.38 Acres of Land*, 80 F.3d at 1078 (quoting *Daubert* at 596). And again, "as a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration." *Primrose* at 562 (quoting *14.38 Acres of Land* at 1077); *see also Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

Defendants remaining arguments (*i.e.* Dr. Lilly has failed "to keep up with modern science" and is inherently biased; Dr. Lilly's methodology is unreliable; other experts disagree with many of Dr. Lilly's findings) are either merely repetitive of arguments already addressed within this Ruling, or are matters for cross-examination.[8]

---

[7]At the time Dr. Lilly saw plaintiff, she was taking Lortab, Soma and Xanax. When asked whether those medications in combination can produce "unintended consequences," Dr. Lilly answered in the affirmative. He further explained, "[I]t's up to us to be able to decide whether the problems are related to that or are related to the - - to the trauma we're dealing with, but the medications were given for those symptoms that she presented with." Dr. Lilly was then asked, "So you didn't have a concern about that particular combination of medications in this case?" Dr. Lilly responded, "No."

[8]Generally, defendants argue as follows: defendants' neurologist testified it is important to review a patient's academic and emergency room records; defendants' *neuropsychologist* disagrees with the opinions of Dr. Lilly; Dr. Lilly is "patent[ly] biased" because the majority of his expert testimony is provided on behalf of plaintiffs; Dr. Lilly's clinical method is not as reliable as defendants' preferred method; defendants' neurologist disagrees with the opinions of Dr. Lilly (*e.g.* that plaintiff suffers from

In light of the foregoing, defendants' motion in limine [Doc. 86] is DENIED.

THUS DONE AND SIGNED in Lafayette, Louisiana, this ___12___ day of June, 2013.

_____
REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

hyperhidrosis); and plaintiff's *neuropsychologist* disagrees with Dr. Lilly's finding of PTSD.